AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

**(UNDER SEAL)**

for the

Central District of California

| | |
|---|---|
| **LODGED**<br>CLERK, U.S. DISTRICT COURT<br>**06/08/2026**<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ DVE _____ DEPUTY | **FILED**<br>CLERK, U.S. DISTRICT COURT<br>**06/08/2026**<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ KH _____ DEPUTY |

United States of America

v.

MAHENDER MAKHIJANI,

Defendant.

Case No. 8:26-mj-00387-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about September 26, 2024 in the county of Orange in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1344 (1) | Bank Fraud |
| 18 U.S.C. § 2 (b) | Aiding and Abetting |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_/s/ Koon Hong Kwok_
*Complainant's signature*

Koon Hong Kwok, Special Agent, FHFA-OIG
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   06/08/2026

/s/ Autumn D. Spaeth
*Judge's signature*

City and state:   Santa Ana, California

Honorable Autumn D. Spaeth, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kevin Y. Fu (x3576)

## AFFIDAVIT

I, Koon Hong Kwok, being duly sworn, declare and state as follows:

### I.    INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Housing Finance Agency – Office of Inspector General ("FHFA-OIG") and have been so employed since January 2023.  I have also served as a sworn law enforcement officer for more than a year for the U.S. Department of Housing and Urban Development – Office of Inspector General ("HUD-OIG").  Prior to my law enforcement career, I was an auditor for more than 11 years with HUD-OIG.  I earned a Bachelor of Business Administration degree in accounting in 2009.  In addition, I became a Certified Fraud Examiner through the Association of Certified Fraud Examiners in December 2014.  I also completed a 12-week Criminal Investigator Training Program from July 2021 to October 2021 and a 3.5-week Inspector General Investigator Training Program in January 2022.

2.    In my position as an SA with FHFA-OIG, I am assigned to investigate fraud regarding FHFA-OIG assets and interests. In this capacity and in my prior position with HUD-OIG, I have conducted multiple criminal investigations, including investigations relating to mortgage fraud, bank fraud, wire fraud, perjury, grand theft, public corruption, and grant fraud. I have experience interviewing witnesses, analyzing files, and conducting search and arrest warrants.

1

## II. **PURPOSE OF AFFIDAVIT**

3.    This affidavit is made in support of an arrest warrant and criminal complaint charging Mahender Makhijani ("MAKHIJANI") with bank fraud, in violation of 18 U.S.C. §§ 1344(1) and 2(b).

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically stated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and any dates and times are on or about those dates and times.

## III. **SUMMARY OF PROBABLE CAUSE**

5.    Beginning in or around 2017, Cantor Group V, LLC ("Cantor V") established a lending relationship with Bank #1. As discussed below in this affidavit, Cantor V is one of numerous entities that I believe MAKHIJANI controls.  Under the terms of the agreement between Bank #1 and Cantor V, Bank #1 would advance funds to Cantor V for Cantor V to originate or purchase loans secured by real property.  Cantor V was supposed to then pledge the loans it had secured, and the underlying real property securing those loans, to Bank #1 as collateral, paying back Bank #1 from the proceeds of those loans.

6.    Pursuant to the terms of their loan agreement, Cantor V could only pledge to Bank #1 loans in which Cantor V had

2

secured the first position lien in the underlying property securing the loan.  The first lien is important because it means that if the borrower on the loan is in default, Bank #1, through Cantor V's pledge of the loan to Bank #1, would be first in line to foreclose on the underlying property securing the loan.  By contrast, a second or later lien is worth much less as collateral because Bank #1's ability to foreclose on the real property securing the loan would be subordinated to other creditors.

7.   As part of its due diligence to make sure that Cantor V had indeed only pledged loans backed by a first lien in the underlying real property, Bank #1 required Cantor V to submit title insurance policies that showed Cantor V's first lien position.

8.   From September 2024 to April 2025, MAKHIJANI falsified and caused to be falsified title insurance policies to make the policies state that Cantor V or Cantor Group IV, LLC ("Cantor IV," another entity he controls) was in the first lien position with respect to certain real estate securing pledged collateral. However, genuine versions of the title insurance policies revealed the truth, which is that no Cantor entity was in the first lien position.

9.   After falsifying and causing the title insurance policies to be falsified, MAKHIJANI caused an employee who worked for him at the time, Individual #1, to submit those false title insurance policies to Bank #1.

3

10. Around that time, MAKHIJANI also engaged in several teleconferences with representatives from Bank #1 and gave false explanations for Cantor V's title issues. MAKHIJANI also caused Individual #1 to submit a spreadsheet with false explanations for the title issues to Bank #1 on December 16, 2024.

11. Bank #1 is an FDIC-insured financial institution that relied on the false information that MAKHIJANI provided in making its lending decisions to Cantor V. Under the terms of their contract, Bank #1 could exercise a number of rights if it were to discover that it was not in the first lien position, such as to demand that Cantor V remedy the value of the collateral, appoint receivers to control the pledged collateral, and/or require immediate repayment of the outstanding loan amount (nearly $100 million). Indeed, a bank executive from Bank #1 stated that if he had known the true lien positions of the collateral that Cantor V had pledged, Bank #1 would have considered Cantor V to be in default and demanded immediate, full repayment, which would have required Cantor V to repay Bank #1 nearly $100 million. Instead, by providing false documents to Bank #1, MAKHIJANI deprived Bank #1 of the ability to exercise its rights and caused Bank #1 to continue its lending relationship with Cantor V when it otherwise would not have.

12. MAKHIJANI has repeatedly threatened others and carried out acts of intimidation, including having notices of eviction posted at the residences of another businessman's family members and causing men to break into the businesses of that

4

businessman.  Numerous witnesses have told investigators that they are threatened and intimidated by MAKHIJANI.

13.  MAKHIJANI has also told a person cooperating with the government, Individual #1, that he would run away if necessary, noting that nothing is in his name and that he is not a U.S. citizen.  As demonstrated below, MAKHIJANI has gone to great lengths to hide his involvement with, and insulate himself from, his businesses' activities by having others serve as signatories and in nominal roles at companies that MAKHIJANI controls.  He has also attempted to conceal his finances by maneuvering funds in convoluted ways through numerous LLCs, and the government has not been able to trace all of MAKHIJANI's finances, although it has reason to believe MAKHIJANI has significant financial resources.  MAKHIJANI also has used a different phone for what the government cooperator has described as "shady" dealings, again demonstrating MAKHIJANI's willingness to take steps to conceal his activities.  MAKHIJANI has had access to private jets and is a citizen of India and owns a home there.

## IV. STATEMENT OF PROBABLE CAUSE

### A.  MAKHIJANI Caused False Title Policies to be Sent to Bank #1

14.  On August 18, 2025, Bank #1 filed a verified complaint[1] against Cantor V and others in the Superior Court of the State of California, County of Los Angeles, in case number 25STCV24263.  According to FDIC's BankFind website, Bank #1 is

---

[1] The civil complaint was verified by the Senior Vice President and Division Chief Credit Officer at Bank #1, under penalty of perjury after he had reviewed Bank #1's records.

an FDIC-insured financial institution (FDIC Cert #57512). Unless otherwise noted, the following statements in this section (IV.A) are based on my review of the Bank #1 complaint.

15.  On or about October 28, 2024, Bank #1 extended a $100 million warehouse revolving credit facility to Cantor V.  As explained in the complaint, "[a] warehouse facility lets a lender advance funds so the borrower can originate or buy mortgage loans, hold them temporarily as inventory, and repay the advances from sale or payoff of those loans -- then re-borrow against a borrowing base made up only of eligible loans. The pledged loans and their cash proceeds are the collateral, and availability depends on each pledged loan being backed by a valid, perfected first-priority lien."

16.  The Bank #1 loan is governed by a Second Amended & Restated Business Loan and Security Agreement, as amended on July 18, 2025 ("BLSA"), a promissory note, and other loan documents.  The BLSA was signed by Individual #2 as the manager of Cantor Group Manager, LLC ("Cantor Manager"), which is the managing member of Cantor V.  The BLSA was also signed by Investor #1 and Investor #2 as guarantors.  On July 18, 2025, the BLSA was amended to convert the revolving facility to a term loan with a maturity date of May 16, 2026.  As of the date of the Bank #1 complaint, the outstanding balance of the Bank #1 Loan was $98,643,500.

17.  Under the BLSA, Cantor V promised that every mortgage loan pledged to Bank #1 as collateral would be backed by Cantor V's valid and perfected first-priority lien in the real property

6

securing that loan.  Based on my training and experience, I know that lenders prefer the first lien position to guarantee their place at the front of the line for repayment in the event of a borrower's default or foreclosure.  This priority status ensures the lender is repaid before any other creditor, therefore reducing the risk of the loan.  From my investigation, I know that by the third quarter of 2024, Bank #1 required Cantor V to submit title policies to demonstrate that Cantor V was indeed in the first lien position for real property securing the collateral that it pledged to Bank #1.

18.  Based on both the verified complaint's allegations, and my own review of loan documents, I understand that pursuant to the loan agreement between Bank #1 and Cantor V, Bank #1 could exercise a number of rights if it were to discover that it was not in the first lien position, such as demand that Cantor V remedy the value of the collateral, appoint receivers to control the pledged collateral, and/or require immediate repayment of the outstanding loan amount.

19.  On September 26, 2024, then-Cantor V employee Individual #1 submitted two policies to Bank #1 by uploading the files to the Bank #1 ShareFile.  These policies were supposed to be from Stewart Title Guaranty Company ("Stewart Title") and showed Cantor V or Cantor IV in the first lien position.[2] However, when Bank #1 later obtained the same two policies directly from Stewart Title -- as opposed to obtaining those

_____

[2] As discussed below in this affidavit, I believe that MAKHIJANI controls all the Cantor entities, including both Cantor IV and Cantor V.

policies secondhand from Cantor V -- Bank #1 discovered that senior encumbrances, in this case by Bank #2, had been deleted from the title policies that Individual #1 submitted on behalf of Cantor V.  My own review of documents obtained as part of my investigation confirms Bank #1's allegation: for example, in the screenshots below, the title policy on the left was submitted by Individual #1 and shows Cantor V in the first lien position. However, the actual title policy that Bank #1 received directly from Stewart Title, which is the screenshot on the right, shows that the first lien was actually held by Bank #2.  The Bank #2 lien (in the red box) had been deleted in the version of the policy that Individual #1 uploaded to Bank #1's ShareFile:



20.  On October 15, 2024, Individual #1 submitted two more policies to Bank #1.  These policies were supposed to be from Stewart Title and showed Cantor V or Cantor IV in the first lien

position.  But as before, when Bank #1 obtained the title policies directly from Stewart Title a year later, Bank #1 discovered that senior encumbrances, or senior lien positions, had been deleted from the title policies that Individual #1 submitted to Bank #1.

21.  On April 3, 2025, Individual #1 provided Bank #1 six more title insurance policies, this time purportedly from Chicago Title Insurance Company ("Chicago Title").  These policies showed Cantor V in the first lien position.  However, when Bank #1 obtained the title policies directly from Chicago Title months later, Bank #1 discovered that senior lien positions had been deleted from the title policies that Individual #1 submitted to Bank #1 on behalf of Cantor V.

22.  The following chart summarizes senior debt that Cantor V fraudulently deleted from title policies that were submitted to Bank #1 in relation to loans pledged as collateral to Bank #1:

| Date Submitted | Loan No. | Real Lien Holders | Loan Amount(s) | Title Policy |
|---|---|---|---|---|
| 10/15/2024 | 26 | Bank #3 | $10,400,000 | Stewart Title Policy No. M-2923-14382 |
| 9/26/2024 | 32 | Bank #2 | $9,720,000 | Stewart Title Policy No. M-2923-14032 |
| 9/26/2024 | 33 | Bank #2 | $9,720,000 | Stewart Title Policy No. M-2923-14438 |
| 10/15/2024 | 35 | Bank #3 | $10,400,000 | Stewart Title Policy No. M-2923-14378 |
| 4/3/2025 | 37 | Bank #3 | $48,930,000 and $1,500,000 | Chicago Title Policy No. FBSC2500654 |
| 4/3/2025 | 38 | Bank #3 | $48,930,000 and $1,500,000 | Chicago Title Policy No. FBSC2500661 |
| 4/3/2025 | 39 | Bank #3 | $48,930,000 and $1,500,000 | Chicago Title Policy No. FBSC2500642 |
| 4/3/2025 | 43 | Bank #3, Bank #2 | $25,900,000 (Bank #3), | Chicago Title Policy No. FBSC2500646 |

| | | | | |
|---|---|---|---|---|
| | | | $4,333,151.35 (Bank #2) | |
| 4/3/2025 | 44 | Bank #3, Bank #2 | $22,400,000 (Bank #3), $5,990,000 (Bank #2) | Chicago Title Policy No. FBSC2500660 |
| 4/3/2025 | 45 | Bank #4, Bank #2 | $6,470,000 (Bank #4), $8,000,000 (Bank #2) | Chicago Title Policy No. FBSC2500653 |

23.    I have conducted title search analyses, and the results corroborate the title information set forth in Bank #1's complaint as of the time of Bank #1's complaint.[3]

B.    **MAKHIJANI Controls and Directs the Cantor Entities and Continuum Analytics**

24.    Cantor V and the other Cantor entities all share the same office location as a company called Continuum Analytics ("Continuum") at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660 (the "520 Newport Center Drive Address").    The Cantor entities do not have employees of their own separate from employees of Continuum.    As described below, there is probable cause to believe that MAKHIJANI controls the operations of Continuum and the Cantor entities.

25.    According to a California Secretary of State ("CA SoS") Statement of Information filed on February 14, 2019, Cantor V is a Delaware LLC that lists as its business address the 520 Newport Center Drive Address.    The sole manager or

---

[3] Since the time of Bank #1's complaint in August 2025, Bank #1's lien position with respect to the properties may have changed.    For example, Bank #1 may have been elevated to the first lien position on one of the properties with a reconveyance from Bank #2, which was formerly in the first lien position.

member of CANTOR V is Cantor Manager.[4]  In addition to Cantor V, Cantor Manager is or was the managing member of other LLCs, including: Cantor Group II, LLC ("Cantor II"), Cantor Group III, LLC ("Cantor III"), and Cantor IV.  I reviewed an Amended and Restated Operating Agreement for Cantor Manager, dated January 1, 2017.  The operating agreement identifies MAKHIJANI as the sole member of Cantor Manager, and Individual #2 as the initial manager for Cantor Manager.  According to the operating agreement, MAKHIJANI could remove Individual #2 from the manager role at any time with written notice.  A more recent operating agreement from March 31, 2024, lists both MAKHIJANI and Individual #2 as members.

26.  The operating agreement also provides that Cantor Manager's books and records shall be maintained at its principal place of business.  According to a CA SoS Statement of Information filed on December 6, 2023, Cantor Manager lists its principal office and mailing address as the 520 Newport Center Drive Address.

27.  In interviews with the government, Individual #1, a former employee of Continuum, outlined the Cantor entities: Cantor Manager, Cantor Group, Cantor II, Cantor III, Cantor IV, Cantor V, and explained that none of the Cantor entities have

---

[4] I know from training and experience that LLCs are owned by its members.  LLCs can elect to be member-managed or to have manager(s) handle the day-to-day management of the LLC.  The governance specifics are usually set forth in an operating agreement.  Managers can be, but do not have to be, members of the LLC.

employees or office space separate from Continuum.[5]  Individual #1 also explained that all the Cantor entities are controlled by MAKHIJANI.

28.  According to CA SoS records, Continuum is a California stock corporation that was initially formed on or about December 31, 2008, with Individual #2 listed as the incorporator and agent for service of process.[6]  More recent CA SoS filings from January 29, 2026, show Individual #2 as the Chief Executive Officer, Secretary, Chief Financial Officer, and Director of Continuum.  Continuum lists the 520 Newport Center Drive Address as its principal office and mailing address.

29.  In a declaration that MAKHIJANI executed on August 7, 2025, which was filed in connection with legal proceedings, MAKHIJANI described Continuum as "an asset management company that provides services to borrowers and investors across a range of real estate transactions."

30.  Individual #2 is officially listed in multiple sources as the owner and head of Continuum.  In arbitration proceedings, MAKHIJANI has claimed to be a mere employee of Continuum who

---

[5] The government gave immunity to Individual #1 by agreeing not to use the information provided by Individual #1 against him in any criminal proceeding.  However, Individual #1 was informed that he can still be prosecuted for making false statements or for perjury.

[6] The CA SoS website also shows that there is an entity called Continuum Analytics LLC with the 520 Newport Center Drive Address as its mailing address.  The Initial Filing for Continuum Analytics LLC shows that the entity was established on October 31, 2018, in the state of Delaware.  A Statement of Information for Continuum Analytics LLC, filed on February 8, 2022, shows that MAKHIJANI is the manager and member.  A subsequent Statement of Information, filed on October 30, 2025, shows Cantor Manager as the manager.

works for Individual #2, and that Individual #2 controls the Cantor entities.  Individual #2 has testified in arbitration proceedings that he is involved in Continuum at a high level but leaves the day-to-day operations to MAKHIJANI.

31.  However, multiple interviews with individuals familiar with Continuum's workings reveal that MAKHIJANI is the one who exercises control over Continuum and the Cantor entities.  For example, as discussed below, Individual #1, who was a Continuum employee for years, has explained to the government that Individual #2 was a "nobody" at Continuum.  The statements from people familiar with Continuum's workings are supported by the following organizational chart, which was part of a Continuum slide deck obtained from Bank #2, and which notably puts MAKHIJANI at the top of the organization and does not feature Individual #2:



32.   Because the Cantor entities do not have employees or offices separate from Continuum, and because of the evidence that MAKHIJANI controls Continuum, including the statements of Individual #1, who is a former employee of Continuum, I believe that MAKHIJANI controls the Cantor entities in addition to Continuum.

C.   **Bank #1 Explains How Cantor V and MAKHIJANI Defrauded Bank #1**

33.   On November 18, 2025, I and other investigative team members interviewed the Chief Credit Officer at Bank #1, who had verified the complaint that Bank #1 had filed.  Based on the interview, I learned, among other things, the following:

a.   Cantor V's relationship with Bank #1 started in 2017, with a $20 million line of credit, and the line of credit increased to $100 million over the years.  The Chief Credit Officer at Bank #1 was not always involved with Cantor V but became involved during the latter stage of the relationship, after the line had been increased to $100 million.

b.   Although MAKHIJANI was not the legal owner of Cantor V and the Chief Credit Officer of Bank #1 saw Individual #2's signature on bank documents, the Chief Credit Officer of Bank #1 has never spoken to Individual #2 (the nominal head of Continuum).  Rather, the Chief Credit Officer of Bank #1 believed MAKHIJANI to be in charge, as he dealt primarily with MAKHIJANI.

c.   By late 2024, Bank #1 had seen inconsistencies between the due diligence they were performing on their own and

14

the materials provided by Cantor V, including with regard to the lien positions on collateral pledged to Bank #1.  However, MAKHIJANI provided various excuses for these discrepancies.

d.   Eventually, since Bank #1 was not comfortable with the information provided by Cantor V, Bank #1 reached out to the title insurance companies directly and received the relevant title policies directly from the companies rather than through Cantor V.  Bank #1 realized that the policies that they received directly from the companies were different from the policies that Cantor V had provided.  This discovery occurred approximately in August 2025.

e.   Bank #1 relied on the title policies submitted by Cantor V to be accurate and true.  If Bank #1 knew that it was not in first lien position on so much of the collateral that had been pledged, Bank #1 would have called the note -- that is, demanded full repayment.  As noted above in this affidavit, under the terms of their contract, the ability to demand full repayment was among the remedies that Bank #1 could exercise if it were to discover that it was not in the first lien position, as Cantor V had promised.

f.   At this point, Bank #1 has not recovered the outstanding balance of nearly $100 million, but they have not taken the loss yet as Bank #1 has guarantors on the loan from whom they could potentially collect.[7]

---

[7] If the guarantors on the loan were to be held liable, they could themselves be victims of the fraud.

34. On December 8, 2025, I and other investigative team members interviewed a Portfolio Manager at Bank #1. Based on the interview, I learned, among other things, the following:

a. The Portfolio Manager at Bank #1 was given the Cantor V account around 2024. His communications with Cantor V were primarily with MAKHIJANI and Individual #1. From what the Portfolio Manager at Bank #1 perceived, MAKHIJANI was the primary manager of Cantor V and Continuum, and Individual #1 was in a subordinate role.

b. MAKHIJANI and Individual #2 were the authorized signers for Cantor V's borrowing base. The Portfolio Manager at Bank #1 believed that Individual #2 was a senior executive at Continuum and did not have any direct interaction with Individual #2.

c. Bank #1 discovered that Cantor V submitted falsified title policies in August 2025. When Bank #1 renewed Cantor V's line of credit in October 2024, it was not aware that Cantor V was sending altered title policies. Had Bank #1 known that false title policies were being submitted by Cantor V, Bank #1 would not have renewed Cantor V's line of credit.

d. The Portfolio Manager at Bank #1 was shown a spreadsheet that was sent on December 16, 2024, by Individual #1. He explained that the column in the spreadsheet labeled "Cantor V Notes" were responses from Cantor V addressing certain issues that Bank #1 had raised, including issues regarding lien position of pledged collateral. My review of the spreadsheet and investigation has revealed that certain explanations

16

provided by Cantor V to Bank #1 in the "Cantor V Notes" column were false.

e.   The Portfolio Manager at Bank #1 stated that post-pledge documents required by Bank #1 could take time to collect, and Bank #1 was satisfied with Cantor V's explanations but required corroborating documents, which ultimately were not provided.  The Portfolio Manager at Bank #1 added that some of the comments in the Cantor V Notes column reference loans and liens from Bank #3 that would take time to resolve.  At the time, Cantor V was representing that these were clerical issues that would clear up over time, but Bank #1 now knows that it did not have first lien positions on those properties, and that Bank #3 had priority liens over Bank #1.  Had Bank #1 known about Bank #3's priority liens in December 2024, this would have been a material fact that would have caused Bank #1 to escalate its actions more quickly.

f.   In February 2025, the Portfolio Manager at Bank #1 accompanied other Bank #1 employees to an onsite visit at Continuum and Cantor V's offices in Newport Beach, California. The purpose of the visit was to obtain additional documentation from Cantor V because Bank #1 had decided at that point to exit the loan facility and client relationship with Cantor V.

g.   The Bank #1 team met with Individual #1 and MAKHIJANI in a conference room.  Individual #1 and MAKHIJANI provided documents that Bank #1 had already seen but did not include all documents that Bank #1 had requested.  MAKHIJANI was in charge, did most of the talking, and promised to provide the

17

missing documents.  Individual #1 corroborated MAKHIJANI's statements and stated that documents were forthcoming and that he would follow up with what was needed.

h.   Bank #1 told MAKHIJANI and Individual #1 that it wished to exit the loan facility and client relationship with Cantor V, and MAKHIJANI responded that this was best and that Cantor V would help by working to pay off the outstanding balance.  MAKHIJANI also assured the Bank #1 team that everything was fine.

i.   After the onsite meeting, Bank #1 tried to obtain additional documents and had discussions with Cantor V about winding down the loan.  The Portfolio Manager at Bank #1 recalled that in one meeting between Bank #1, Cantor V, and their respective counsels, Bank #1 expressed that discussions had stalled and that Cantor V was in default.

D.   **MAKHIJANI has Used Force and Threats in Prior Business Dealings**

35.   From reviewing sworn testimony from arbitration proceedings between a Southern California Businessman (the "Businessman") and MAKHIJANI, I learned the following:

36.   In 2021, the Businessman negotiated with MAKHIJANI to secure financing in connection with the Businessman's real estate business, and the parties entered into a joint venture around June that year.

37.   By March 2023, the Businessman and MAKHIJANI were in a business dispute.  On March 22, 2023, the Businessman's attorneys sent requests for inspection of books and records to

18

MAKHIJANI.  In return, on March 29, 2023, MAKHIJANI removed the Businessman as the administrative manager of the joint venture. Until then, the Businessman was managing day-to-day operations of various businesses, including Hotel Laguna in Laguna Beach, California.

38.   The Businessman had a phone call with MAKHIJANI, among other participants, shortly after.  According to the Businessman: "[T]he conversation was he wants me to take back my demand for books and records, and if I don't do that, he's going to destroy my reputation in Laguna.  He's going to make sure my kids and my grandkids are on the street.  He's going to make my life miserable.  That's what he said."[8]

39.   Around this time, mobile billboards depicting the Businessman and others' faces were driven around Laguna Beach, suggesting that the Businessman and others were engaged in corruption:



---

[8] In the same legal proceedings, MAKHIJANI denied making threats against the Businessman.

19

40. When confronted about the billboards in the arbitration proceedings, MAKHIJANI claimed that he was not involved in the specifics of the billboard and that he did not "recall the exact discussions" about the billboard, although he stated that he "had some idea some press release was coming."

41. Around May 2, 2023, the Businessman went to Hotel Laguna with others, including security personnel. MAKHIJANI was also at the hotel that day, along with other individuals associated with Continuum. From my review of transcripts of the arbitration proceedings, I believe the two sides disputed who was able to rightfully run operations at Hotel Laguna.

42. The confrontation between the two camps escalated to physical altercations:

 

43. The screenshots above are from a video of the incident that I have reviewed. From the video, it appears that members of security staff associated with Continuum took their direction from the individual in the tan sweater. The individual in the

tan sweater, in turn, appeared to take directions from MAKHIJANI (pictured in sunglasses) minutes before the altercation:

 

44.    Following the incident at Hotel Laguna, associates of Continuum also took over Terra Laguna, a restaurant that the Businessman had operated since 2018.  In the same legal proceedings, when asked whether he instructed a Continuum employee and security personnel to go to the Terra restaurant to take control of the restaurant, MAKHIJANI replied: "To transition operations, yes."

45.    On July 24, 2023, Continuum personnel and their security went to the offices of 4G Wireless, Inc. ("4G"), a company founded by the Businessman.  According to a declaration filed as an exhibit in the proceedings and the Businessman's testimony, the Continuum personnel brought security guards and forcibly entered 4G's offices by shattering the glass door, as depicted in the screenshots below:

 

46. According to a declaration filed as part of the legal proceedings, the men surrounded and intimidated employees of 4G once inside the building.

47. The Continuum personnel and security also took equipment and files from the 4G offices:

 

48. In the legal proceedings, MAKHIJANI was asked whether he had instructed a Continuum employee and others to go to 4G on that day. MAKHIJANI replied: "Yes, after I got a call from [a

22

Continuum employee] saying that, you know, there is a problem with the removal of data and documents at the office." MAKHIJANI was also asked: "And you instructed Continuum personnel to take all of the documents and computers out of that office, right?" MAKHIJANI replied: "After documents were being taken out, yes, I told them to preserve the documents."

49. In addition to the billboard incidents and the conduct involving security described above, notices of eviction were posted on the buildings where the Businessman lived, where the Businessman's pregnant daughter lived with another child, and where another of the Businessman's daughters and her partner lived. In legal proceedings, MAKHIJANI denied threatening to put the Businessman and his children and grandchildren out on the street but admitted that he approved notices of eviction to be posted on those locations. As discussed below, threats are part of a pattern of alleged intimidation and harassment by MAKHIJANI against those who disagree with him.

E. **Investors Confirm MAKHIJANI's Control Over Continuum and Cantor**

50. Federal agents interviewed Investor #2 and his assistant on a number of occasions and learned, among other things, the following:

a. Investor #2 first met MAKHIJANI over a decade ago. MAKHIJANI pitched Investor #2 on the idea of purchasing distressed properties that were in bankruptcy and foreclosure sales.

23

b.    MAKHIJANI told Investor #2 that he started Continuum.  Investor #2 has never met Individual #2, the nominal head of Continuum, and did not know about him until recently. Investor #2 believes that MAKHIJANI is in charge of Continuum and runs Continuum.

c.    It was MAKHIJANI's practice to have other people sign documents and to limit the documents that he signs.  In the early stages of their business dealings, MAKHIJANI told Investor #2 that MAKHIJANI's credit was used up, so he could not be a signer on all the loans.

d.    Investor #2 saw an opportunity to have Continuum manage properties while he received additional cash flow.  Over an 11-year period, Investor #2 invested in approximately 25 properties with MAKHIJANI and Continuum but stopped investing some time ago.

e.    Investor #2 initially received monthly distribution checks from Continuum, although later the checks came in every other month.  Investor #2's understanding is that the distribution checks represented his part of the net positive cash flow in each property investment, and Investor #2 defined net cash flow as rents collected minus any expenses.

f.    Investor #2 stated that MAKHIJANI goes to India often and has family in India, although MAKHIJANI has never mentioned that he has money overseas.

g.    Investor #2 said that MAKHIJANI was an intimidating individual and that MAKHIJANI told him he kept a gun strapped to his ankle.  On at least one occasion, MAKHIJANI

24

told Investor #2 that his father taught him to kill his enemies, which Investor #2 perceived as a threatening message.

**F.    Individual #1 Provides Insight into MAKHIJANI's Fraudulent Conduct and Threats**

51.   In March and April 2026, law enforcement participated in interviews with Individual #1, a former Continuum employee. From these interviews, I learned, among other things, the following:

**1.    Individual #1 Described MAKHIJANI's Fraudulent and Deceptive Practices.**

52.   Individual #1 became associated with Continuum in approximately 2017.  By approximately 2021, Individual #1 also became more involved in Continuum's lines of credit and communicated with banks, including Bank #1.

53.   Individual #1 stated that Individual #2, the nominal head of Continuum, was in fact a "nobody" at Continuum. Individual #2 would receive calls from lenders because his name was on documents and would need to call the Continuum office to determine what to say.  There was a signature stamp for Individual #2, who lived in Northern California, at the Continuum offices in Newport Beach.

54.   Individual #2 knew that his name was being used, and he would need to be prepared by Individual #1 or other Continuum employees before calls with lenders or outside parties.

55.   MAKHIJANI has told Continuum employees not to listen to Individual #2.  Individual #1 stated that MAKHIJANI has also

threatened Individual #2, including threatening to bankrupt Individual #2.

56. Each Continuum investment property would have its own LLC. MAKHIJANI previously approached Individual #1, saying he needed more managers for the LLCs, and MAKHIJANI offered to pay $5,000 per year for each manager. Many people, including members of Individual #1's family, became "managers" for certain LLCs, although Individual #1's family members were not paid to be managers.

57. When Individual #1 asked MAKHIJANI why they needed others to serve as managers for the LLCs, MAKHIJANI answered that they were sharks in the distressed world who took advantage of people -- which Individual #1 took to refer to Continuum's business of purchasing distressed properties. MAKHIJANI said that there was high litigation risk given the nature of their business, and he wanted the other managers to be the subjects of the litigation rather than himself. However, MAKHIJANI assured Individual #1 that he would provide financial support and take full responsibility, and that there would be no exposure for the people who served as managers.

58. Individual #1 stated that he sometimes would receive large funds transfers from Continuum into his personal bank account before moving those funds to LLCs affiliated with Continuum at MAKHIJANI's direction.

59. When Individual #1 questioned why he needed to move funds in this way, MAKHIJANI explained that the purpose was to hide the fact that the money was coming from Continuum or a

26

related entity.  MAKHIJANI stated that this was to protect the company and that he engages in this practice with many others.

60.  Individual #1 stated that JR Inland Investments LLC and ZM LLC are both entities controlled by MAKHIJANI.  I know from public records searches that JR Inland Investments LLC owns the home in Corona Del Mar, California, where MAKHIJANI lives. I also know from public records searches that ZM LLC owns the home next door.  Individual #1 stated that MAKHIJANI's in-laws sometimes live in the next-door home that is officially owned by ZM LLC.

61.  Individual #1 stated that nothing was sent on time to Bank #1, and because of MAKHIJANI's relationship with Bank #1 and the stories he would spin for Bank #1, Bank #1 would bend the rules for MAKHIJANI.

62.  Individual #1 stated that he could never send anything to Bank #1 without MAKHIJANI's approval.  MAKHIJANI directed which loans were to be pledged on the borrowing base with Bank #1.

63.  MAKHIJANI told Individual #1 about a loophole in which Cantor V would pledge a loan to Bank #1 and then have a grace period to provide required documentation.  Before the deadline of the grace period, MAKHIJANI would often replace the loan pledged to Bank #1 with another loan to re-start the grace period clock.

64.  To Individual #1's knowledge, Cantor V operated correctly until the "Laguna" issues -- which I believe refers to MAKHIJANI's dispute with the Businessman discussed above.

27

65.  According to Individual #1, until 2024, Bank #1 only required broker price opinions for properties.  However, Bank #1 later started requiring actual appraisals.  MAKHIJANI was picky about which brokers and appraisers to use and would manipulate the numbers to reach a desired outcome.  MAKHIJANI told Individual #1 that they needed to reach a target value, and if the broker or appraiser came back with a different number, then Individual #1 needed to adjust the rent rolls or profit and loss figures to increase the value.  Individual #1 believes he sent approximately 5-10 falsified rent rolls to appraisers or brokers.

66.  In 2024, after the dispute with the Businessman, MAKHIJANI asked Individual #1 to falsify title policies that were to be submitted to Bank #1 in order to falsely show that Cantor V was in the first lien position for collateral pledged to Bank #1.  MAKHIJANI personally falsified the first few title policies on Individual #1's laptop in order to show Individual #1 how he wanted it to be done, and then Individual #1 falsified the final few policies subject to MAKHIJANI's approval before uploading the falsified files to Bank #1 at MAKHIJANI's direction.

67.  Individual #1 explained that MAKHIJANI showed Individual #1 how to remove the metadata in the pdfs that they were falsifying to hide the fact that they were manipulating the documents, including by manually changing metadata fields or by printing and scanning the altered documents.

28

68.   Individual #1 confirmed that on September 26, 2024, he uploaded two falsified title policies relating to real property at 23750 Alessandro Boulevard to Bank #1's ShareFile link. Individual #1 stated that he witnessed MAKHIJANI falsify those documents in Adobe to put a Cantor entity in the first lien position when it was not in the first lien position. After MAKHIJANI manipulated the title policies, he directed Individual #1 to upload the falsified policies to Bank #1, which Individual #1 did.

69.   Individual #1 confirmed that on October 15, 2024, he uploaded two falsified title policies to Bank #1's ShareFile link, relating to real property at 2460 South Grove and 2522 South Grove. Individual #1 stated that he witnessed MAKHIJANI manipulate those title policies to put a Cantor entity in the first lien position when it was not in the first lien position. After MAKHIJANI falsified the title policies, he directed Individual #1 to upload the falsified policies, which Individual #1 did.

70.   Individual #1 confirmed that on April 3, 2025, he uploaded six falsified title policies to Bank #1's ShareFile link. Individual #1 stated that this time, he was the one to manipulate these files, although he did so at MAKHIJANI's direction. After he falsified the files, he checked his work with MAKHIJANI before uploading the manipulated title policies to Bank #1's ShareFile link.

71.   Individual #1 relayed that he was aware of calls with Bank #1 representatives, and that he participated in some but

29

not all of the calls.  Individual #1 stated that his absence was sometimes strategic, so that MAKHIJANI could claim that Individual #1 was out of the office or otherwise unavailable to answer questions, when that was not true.

72.  Individual #1 was shown a December 16, 2024 email that he sent to Bank #1, attaching a spreadsheet with the "Cantor V Notes" column.  Individual #1 stated that he typed in Cantor V's responses verbatim from MAKHIJANI's instructions.

73.  Individual #1 stated that a portion of the rationales on the spreadsheet were false, and that the responses on the spreadsheet bought Cantor V some time.

2.    MAKHIJANI Threatened Individual #1 and Stated He Would Flee if Necessary.

74.  Individual #1 stated that he is afraid of MAKHIJANI because MAKHIJANI has money and power.  MAKHIJANI has:

a.    Stated to Individual #1 that he knows where Individual #1 lives, that Individual #1 knows what he is capable of doing (likely referring to what MAKHIJANI did during his dispute with the Businessman), and that he would "kill" Individual #1 if he crossed MAKHIJANI.

b.    Threatened to bankrupt Individual #1.

c.    Threatened to have Individual #1's children ejected from school.

d.    Threatened to have Individual #1's kids sent to welfare and to put Individual #1's family on the street.

e.    Threatened to ruin Individual #1's reputation. According to Individual #1, MAKHIJANI would host parties with

30

sex workers and drugs, which were attended by, among others, current or former bank employees.  MAKHIJANI blackmailed Individual #1 by threatening to allege Individual #1's participation in the activities at the parties.

> f.   Individual #1 has stated that MAKHIJANI uses a different phone to arrange these parties and to engage in what Individual #1 has described as "shady" dealings.

75.   MAKHIJANI has also told Individual #1 that MAKHIJANI's name is not on anything, that he is not even a U.S. citizen, and that if anything happened, he would run away.

76.   Individual #1 stated that MAKHIJANI fired him in August 2025 after he could not meet MAKHIJANI's demands while Individual #1 was on vacation abroad with his family.

## G.   MAKHIJANI's Obfuscation of Assets and Possession of Significant Foreign Assets

### 1.   MAKHIJANI Obfuscates His Financial Resources and Assets.

77.   As discussed, even MAKHIJANI's home is not in his name.  Rather, it is held by JR Inland Investments LLC. Individual #1 also explained that MAKHIJANI has sent him funds and asked him to move funds for the express purpose of concealing the true source and nature of the funds.

78.   My and other investigating agents' review of bank records or analysis of such records has confirmed that MAKHIJANI is involved in suspicious movement of funds that appear designed to conceal the source and nature of the funds.  I have observed funds moving rapidly through multiple accounts, in similar

31

amounts, on the same day or within a few days, with no discernable reason for moving the funds in this convoluted way.

79. For example, Internal Revenue Service Criminal Investigation Special Agent Rodolfo Mendoza traced loan proceeds from Bank #6, which shows money being deposited into Cantor IV's Bank #6 account and then immediately moved to Cantor IV's account at another bank, Bank #5. The analysis shows that proceeds flowed as follows:

a. From Cantor IV's Bank #5 account, the proceeds flowed to Alessandro.

b. The proceeds then flowed to a Continuum Analytics Bank #5 account ending in 4074.

c. From that Continuum Analytics Bank #5 account, the loan proceeds were sent via multiple wires to an account held jointly in MAKHIJANI's and Individual #2's names at Bank #5.

d. From MAKHIJANI and Individual #2's Bank #5 account, multiple wires were sent to an account held in Individual #2's name at Bank #5.

e. From Individual #2's Bank #5 account, proceeds were combined into one wire directed to Individual #2's Bank #1 account.

f. From Individual #2's account at Bank #1, the proceeds were then split into multiple transactions. These transactions ultimately resulted in wires to Fidelity National Title Insurance and to the Continuum Analytics Bank #5 account ending in 4074, where the Continuum Analytics funds were

commingled and further disbursed through additional transactions.  A portion of the Bank #1 funds was first routed through MAKHIJANI and Individual #2's Bank #5 account before reaching the final destinations.  An illustration of what I described is shown below (color coded to show the different accounts):

| Date: | Amount: | From: | To: |
|---|---|---|---|
| 1/4/2024 | $5,685,000 | Bank #6 – Commercial Loan | Cantor Group IV – Bank #6 account ending in 0834 |
| 1/4/2024 | $5,685,000 | Cantor Group IV – Bank #6 account ending in 0834 | Cantor Group IV – Bank #5 account ending in 4264 |
| 1/4/2024 | $5,685,000 | Cantor Group IV – Bank #5 account ending in 4264 | Cantor Group V – Bank #5 account ending in 7580 |
| 1/4/2024 | $5,685,000 | Cantor Group V – Bank #5 account ending in 7580 | Alessandro Group – Bank #5 account ending in 5824 |
| 1/4/2024 | $5,685,000 | Alessandro Group – Bank #5 account ending in 5824 | Continuum Analytics – Bank #5 account ending in 4074 |
| 1/4/2024 | $2,000,000 | Continuum Analytics – Bank #5 account ending in 4074 | Makhijani & Individual #2 – Bank #5 account ending in 5743 |
| 1/4/2024 | $2,000,000 | Makhijani & Individual #2 – Bank #5 account ending in 5743 | Individual #2 – Bank #5 account ending in 6252 |
| 1/5/2024 | $2,500,000 | Continuum Analytics – Bank #5 account ending in 4074 | Makhijani & Individual #2 – Bank #5 account ending in 5743 |
| 1/5/2024 | $500,000 | Continuum Analytics – Bank #5 account ending in 4074 | Makhijani & Individual #2 – Bank #5 account ending in 5743 |
| 1/5/2024 | $2,500,000 | Makhijani & Individual #2 – Bank #5 account ending in 5743 | Individual #2 – Bank #5 account ending in 6252 |
| 1/5/2024 | $500,000 | Makhijani & Individual #2 – Bank #5 account ending in 5743 | Individual #2 – Bank #5 account ending in 6252 |
| 1/5/2024 | $3,000,000 | Individual #2 – Bank #5 account ending in 6252 | Individual #2 – Bank #1 account ending in 1376 |
| 1/16/2024 | $400,000 | Individual #2 – Bank #1 account ending in 1376 | Makhijani & Individual #2 – Bank #5 account ending in 5743 |

| | | | |
|---|---|---|---|
| 1/16/2024 | $400,000 | Makhijani & Individual #2 – Bank #5 account ending in 5743 | Continuum Analytics – Bank #5 account ending in 4074 |
| 1/22/2024 | $1,000,000 | Individual #2 – Bank #1 account ending in 1376 | Makhijani & Individual #2 – Bank #5 account ending in 5743 |
| 1/22/2024 | $954,000 | Makhijani & Individual #2 – Bank #5 account ending in 5743 | Continuum Analytics – Bank #5 account ending in 4074 |
| 1/29/2024 | $180,000 | Individual #2 – Bank #1 account ending in 1376 | Continuum Analytics – Bank #5 account ending in 4074 |
| 1/31/2024 | $1,535,000 | Individual #2 – Bank #1 account ending in 1376 | Fidelity National Title Insurance |

80.   As described above, Individual #1 has explained that MAKHIJANI deliberately moves funds in ways intended to conceal and obscure the true source of the funds.

2.   MAKHIJANI Possesses Significant Foreign Assets.

81.   As recently as August 2023, agents have seen large dollar amounts wired from bank accounts in the United States that agents believe MAKHIJANI controls to bank accounts in India in MAKHIJANI's name -- for example, from January 2022 to August 2023, agents saw three such wires totaling $850,000.  In arbitration proceedings in 2026, MAKHIJANI has stated that he has bank accounts in India but claimed he only has approximately $50,000 in those accounts.  In the arbitration proceedings, MAKHIJANI also stated that he has a house in India.

3.   MAKHIJANI has Access to Private Planes.

82.   I am also aware that MAKHIJANI has traveled using both commercial airlines and private jets in the past, as agents have seen three flight manifests for domestic travel that show

34

MAKHIJANI as a passenger on private jets, and Continuum has paid millions of dollars over the years to private jet companies.

        4.   <u>Much of MAKHIJANI's Financial Resources and Assets are Unaccounted For</u>.

83.  Given MAKHIJANI's lifestyle, including his use of private jets, two adjacent multi-million dollar homes in Corona Del Mar, CA, as well as a luxury apartment near Fashion Island in Newport Beach, CA, and use of luxury vehicles, including a Bentley, Porsche, and Mercedes G-Wagon, as well as the vast sums of money that plaintiffs allege to have lost in multiple lawsuits (discussed below), I believe that MAKHIJANI has significant financial resources, but the government has not fully traced and accounted for those resources, which are almost certainly not held in MAKHIJANI's name.

    **H.**    <u>**Lawsuits Against MAKHIJANI or His Affiliated Entities**</u>

84.  Many lawsuits alleging fraud have been filed against MAKHIJANI and/or his affiliated entities.  These lawsuits include an arbitration proceeding filed by the Businessman in connection with the business dispute discussed earlier in this affidavit.  In that arbitration proceeding, the arbitrator, the Hon. David A. Thompson (Ret.), found, among other things, that "Claimants have proven Makhijani was personally involved in the fraudulent inducement and other non-contract claims discussed above. . . . Therefore, Makhijani is personally liable for the fraudulent inducement and other non-contract claims based on his

own actions."[9]  Based on public reporting, in May 2026, the arbitrator awarded approximately $1,340,000,000 ($1.34 billion) to the Businessman stemming from the Businessman's legal proceedings against MAKHIJANI and his affiliated entities.

85.  In addition, in another lawsuit brought by Security National Guaranty Inc. in the Superior Court of the State of California, County of Orange (Case No. 30-2023-01347034), a jury found MAKHIJANI and others liable for breach of fiduciary duty and found that MAKHIJANI and others acted with malice, fraud, and/or oppression.  The jury awarded millions of dollars to the plaintiff, including punitive damages.

86.  Investor #2 has also sued MAKHIJANI for, among other things, fraud.

87.  Another bank has also sued to recover more than $60 million in unpaid loans owed to it under two revolving credit facilities to Cantor II and Cantor IV, both entities controlled by MAKHIJANI, alleging fraud relating to the collateral on those loans.

## V.  CONCLUSION

88.  For all the reasons described above, there is probable

//

//

//

---

[9] The arbitrator declined to find MAKHIJANI personally liable for the fraudulent inducement and other non-contract claims based on an alter ego theory as he noted that the theory is "an extreme remedy, sparingly used," and that the evidence showed that Individual #2, not MAKHIJANI, was the owner of Continuum, and that in the hierarchy of Continuum, MAKHIJANI worked under and reported to Individual #2.

cause to believe that MAKHIJANI has committed bank fraud, in violation of 18 U.S.C. §§ 1344(1) and 2(b).

/s/ Koon Hong Kwok
Koon Hong Kwok
Special Agent, FHFA-OIG

Subscribed to and sworn before me
this _8_ day of June 2026.

/s/ Autumn D. Spaeth
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

37