**F I L E D**
CLERK, U.S. DISTRICT COURT

June 17, 2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ pd _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

March 2026 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 8:26-cr-00087 - DOC |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1344(1): Bank Fraud; 18 U.S.C. § 1014: False Statement to a Bank; 18 U.S.C. § 982: Criminal Forfeiture] |
| MAHENDER KALICHARAN MAKHIJANI, | |
| Defendant. | |

The Grand Jury charges:

COUNTS ONE THROUGH FOUR

[18 U.S.C. §§ 1344(1), 2(b)]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.   Defendant MAHENDER KALICHARAN MAKHIJANI, a resident of Newport Beach, California, controlled and operated an asset management company called Continuum Analytics ("Continuum"), which he had formed in or around 2008, from offices located in Newport Beach, California.

2.   Continuum purported to provide a range of services in connection with real estate transactions.  Continuum represented to

lenders and investors that it used a proprietary algorithm that defendant MAKHIJANI had developed, which allowed it to profit from distressed assets that it would acquire.

3. Defendant MAKHIJANI caused numerous special purpose entities to be created, many of which were organized as limited liability companies and affiliated with Continuum. Defendant MAKHIJANI controlled these special purpose entities, which included Cantor Group Manager, Cantor Group, Cantor Group II, Cantor Group III, Cantor Group IV, and Cantor Group V ("Cantor V").

4. Although defendant MAKHIJANI exercised control over Continuum and its affiliated entities, including Cantor V, defendant MAKHIJANI minimized his role by having other people serve as the nominal officers of Continuum and its affiliated entities. For example, on paper, Individual 1 was at times identified as the Chief Executive Officer of Continuum and the manager of several affiliated entities even though, in fact, defendant MAKHIJANI controlled and exercised decision-making authority over Continuum and these affiliated entities.

5. Beginning in or around 2017, Cantor V established a lending relationship with a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation (the "Victim Bank"). By 2024, the Victim Bank had extended to Cantor V a revolving credit facility, up to $100 million, on which Cantor V could continually draw and repay. The Victim Bank understood that Cantor V would use the funds borrowed under the credit facility to originate and purchase loans secured by real property and either collect interest as well as the return of the principal of the loan or, if the loan

were in default, acquire the real property securing the loan through foreclosure.

6.    The lending agreement between Cantor V and the Victim Bank required that Cantor V pledge the loans that Cantor V acquired to the Victim Bank as collateral for the revolving credit facility.  To be acceptable as collateral under the terms of the agreement, Cantor V was required to ensure that each pledged loan was secured by real property and that Cantor V had a first priority lien in that real property.  As a result, the Victim Bank, through Cantor V's pledge of acceptable collateral, would have a first priority lien in the real property underlying the pledged loan.  Such a first priority lien ensured the Victim Bank's ability to foreclose on the property securing the pledged loan if the loan were in default.  Loans for which Cantor V did not have a first priority lien were unacceptable as collateral because the Victim Bank would have lacked assurance that it could foreclose on the property securing the pledged loan.

7.    To ensure that Cantor V complied with the terms of the lending agreement, the Victim Bank required, among other things, that Cantor V submit title insurance policies showing Cantor V's first lien position.

8.    The lending agreement also provided that, if Cantor V was not in the first lien position, the Victim Bank could exercise its rights to, among other things, demand that Cantor V remedy the value of the collateral, appoint receivers to control the pledged collateral, and/or require immediate repayment of the outstanding balance and interest owed under the lending agreement.

9. By no later than in or around October 2024, Cantor V had drawn down on the $100 million credit facility and owed approximately $100 million to the Victim Bank.

B. THE SCHEME TO DEFRAUD

10. Beginning no later than September 2024, and continuing until at least August 2025, in Orange County, within the Central District of California, and elsewhere, defendant MAKHIJANI, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud the Victim Bank of something of value, namely, its remedies for the inadequate collateral, including full repayment of the outstanding balance and interest owed under the lending agreement, and the continued extension of credit, by means of material false and fraudulent pretenses and representations.

11. The fraudulent scheme operated and was carried out, in substance, in the following manner:

a. Defendant MAKHIJANI altered and caused to be altered title insurance policies to falsely represent that a Cantor entity was in the first lien position with respect to the real properties securing collateral pledged to the Victim Bank (the "fraudulent title policies") when, in reality, the identified Cantor entity was not in the first lien position.

b. Defendant MAKHIJANI caused the fraudulent title policies to be submitted to the Victim Bank to falsely represent that a Cantor entity, and thus the Victim Bank, had the first priority lien in the collateral as required by the lending agreement.

c. When representatives from the Victim Bank raised questions about discrepancies regarding lien positions, noting that

4

Cantor V did not appear to be in the first lien position based on their title searches, defendant MAKHIJANI provided and directed at least one other person to provide false and misleading explanations to the Victim Bank.

d.    The false title policies and false representations misled the Victim Bank about the value of its collateral and prevented the Victim Bank from discovering that it had not been provided with the collateral required by the lending agreement.

e.    As a result, the Victim Bank did not demand, as was its right under the lending agreement, immediate repayment of the outstanding loan balance and interest due, and did not demand, as was also its right under the lending agreement, that Cantor V increase the value of the collateral.  Instead, as a further result of the fraudulent scheme, in October 2024, the Victim Bank extended further credit to Cantor V, and in July 2025, the Victim Bank converted the lending agreement into a term loan with a maturity date in May 2026.

f.    In or around August 2025, the Victim Bank obtained the title policies directly from the title insurance companies themselves and confirmed that the collateral that had been posted did not meet the requirements of the lending agreement.  Despite the Victim Bank's attempts to collect the outstanding balance and interest owed under the lending agreement, defendant MAKHIJANI did not cause Cantor V to pay the balance owed, causing the Victim Bank and any third-party guarantors to sustain losses of approximately $100 million.

C.    EXECUTIONS OF THE SCHEME

12.  On or about the following dates, in Orange County, within the Central District of California, and elsewhere, defendant

MAKHIJANI caused the following acts to be committed, each of which constituted an execution of the fraudulent scheme:

| COUNT | DATE | ACT |
|---|---|---|
| ONE | September 26, 2024 | Submission of fraudulent title policies from Stewart Title Guaranty Company (Policy Nos. M-2923-14438 and M-2923-14032) via upload to the Victim Bank's ShareFile. |
| TWO | October 15, 2024 | Submission of fraudulent title policies from Stewart Title Guaranty Company (Policy Nos. M-2923-14378 and M-2923-14382) via upload to the Victim Bank's ShareFile. |
| THREE | December 16, 2024 | Transmission to the Victim Bank of Excel spreadsheet containing false explanations for title discrepancies that the Victim Bank had identified. |
| FOUR | April 3, 2025 | Submission of fraudulent title policies from Chicago Title Insurance Company (Policy Nos. FBSC2500653, FBSC2500660, FBSC2500646, FBSC2500642, FBSC2500654, and FBSC2500661) via upload to the Victim Bank's ShareFile. |

COUNTS FIVE THROUGH FOURTEEN

[18 U.S.C. §§ 1014, 2(b)]

C.   INTRODUCTORY ALLEGATIONS

13.   The Grand Jury realleges paragraphs 1-9 of the Indictment here.

D.   FALSE STATEMENTS

14.   On or about the dates set forth below, in Orange County, within the Central District of California, and elsewhere, defendant MAKHIJANI knowingly made, and willfully caused to be made, false statements for the purpose of influencing the action of a financial institution, namely, the Victim Bank, in connection with the lending relationship between the Victim Bank and Cantor V, pursuant to which the Victim Bank had advanced nearly $100 million to Cantor V. Specifically, on the dates and by the acts set forth below, defendant MAKHIJANI caused altered title policies to be submitted to the Victim Bank, each of which falsely stated and represented that a Cantor entity was in the first lien position with respect to collateral that had been pledged to the Victim Bank, when in truth and in fact, and as defendant MAKHIJANI then knew, the Cantor entity was not in the first lien position:

| COUNT | DATE | ACT |
|-------|------|-----|
| FIVE | September 26, 2024 | Submission of fraudulent title policy from Stewart Title Guaranty Company (Policy No. M-2923-14438) to the Victim Bank's ShareFile. |
| SIX | September 26, 2024 | Submission of fraudulent title policy from Stewart Title Guaranty Company (Policy No. M-2923-14032) to the Victim Bank's ShareFile. |

7

| COUNT | DATE | ACT |
|---|---|---|
| SEVEN | October 15, 2024 | Submission of fraudulent title policy from Stewart Title Guaranty Company (Policy No. M-2923-14378) to the Victim Bank's ShareFile. |
| EIGHT | October 15, 2024 | Submission of fraudulent title policy from Stewart Title Guaranty Company (Policy No. M-2923-14382) to the Victim Bank's ShareFile. |
| NINE | April 3, 2025 | Submission of fraudulent title policy from Chicago Title Insurance Company (Policy No. FBSC2500653) to the Victim Bank's ShareFile. |
| TEN | April 3, 2025 | Submission of fraudulent title policy from Chicago Title Insurance Company (Policy No. FBSC2500660) to the Victim Bank's ShareFile. |
| ELEVEN | April 3, 2025 | Submission of fraudulent title policy from Chicago Title Insurance Company (Policy No. FBSC2500646) to the Victim Bank's ShareFile. |
| TWELVE | April 3, 2025 | Submission of fraudulent title policy from Chicago Title Insurance Company (Policy No. FBSC2500642) to the Victim Bank's ShareFile. |
| THIRTEEN | April 3, 2025 | Submission of fraudulent title policy from Chicago Title Insurance Company (Policy No. FBSC2500654) to the Victim Bank's ShareFile. |
| FOURTEEN | April 3, 2025 | Submission of fraudulent title policy from Chicago Title Insurance Company (Policy No. FBSC2500661) to the Victim Bank's ShareFile. |

FORFEITURE ALLEGATION

[18 U.S.C. § 982]

15.  Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), in the event of the defendant's conviction of any of the offenses set forth in Counts One through Fourteen of this Indictment.

16.  The defendant, if so convicted, shall forfeit to the United States of America the following:

(a) All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

17.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party;

///

///

///

9

(c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

                                        A TRUE BILL


                                        _____/S/_____
                                        Foreperson


TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States
Attorney

JENNIFER L. WAIER
Chief Assistant United States
Attorney &
Chief, Criminal Division

MARK P. TAKLA
Assistant United States Attorney
Chief, Orange County Office

KEVIN Y. FU
GREGORY W. STAPLES
Assistant United States Attorneys
Orange County Office

10